DAVID M. ROSENBERG-WOHL (Cal. Bar No. 132924)
HERSHENSON ROSENBERG-WOHL,
A PROFESSIONAL CORPORATION
315 Montgomery St., 10th Fl.
San Francisco, CA 94104
(415) 829-4330
david@hrw-law.com

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KASRA ELIASIEH, M.D., ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, <br><br>       Plaintiff, <br><br> vs. <br><br> LEGALLY MINE, LLC, AND DOES 1-10, <br><br>       Defendants. | Case No. 3:19-cv-5977 <br><br><br> **COMPLAINT [CLASS ACTION]** |

       This is an action that is refiled without prejudice pursuant to order of the Court.

       The previous action, Case No. 3:18-cv-3622, filed August 16, 2018, was ordered to arbitration by the AAA pursuant to the parties' contract and "dismissed without prejudice to reinstatement" by Magistrate Judge Jacqueline Scott Corley on April 30, 2019 [Dckt. 66]. *See* Supplemental Declaration of David M. Rosenberg-Wohl, attached as Exhibit 4 hereto, at ¶ 2 and Exh. A thereto. "Reinstatement" was authorized "should further proceedings be necessary." Dckt. 66 at 15:9-12.

       Further proceedings are now necessary: the AAA has declined to exercise jurisdiction over this contract due to the Defendants' refusal to comply with AAA process. This is the latest in a sequence of Defendants' refusals to comply with legal process. The AAA has therefore permitted Plaintiff to seek relief from the Court. *See* Exhibit 4 hereto, at ¶ 3 and the AAA correspondence set forth at Exhs. B-D thereto.

COMPLAINT [CLASS ACTION] - 1

As before, Plaintiff, Kasra Eliasieh ("Plaintiff"), by and through the undersigned counsel, brings this Complaint against Defendant Legally Mine ("Legally Mine" or "Defendant") and Does 1-10 (together, with "Defendant," as "Defendants") for damages, restitution, declaratory and injunctive relief, and in support thereof states as follows:

## JURISDITION AND VENUE

1. This Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000. Plaintiff is a citizen of California. Defendant is an LLC registered under the laws of Utah. Its two members/registered principals are Ammon McNeff and Daniel J. McNeff, both listed as residents and therefore as citizens of Utah.

2. Legally Mine is subject to personal jurisdiction throughout California pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) because it enters into contracts with physicians such as Plaintiff who reside and practice there.

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) because Legally Mine seeks to do and does business in this county/District, Legally Mine has transacted business with Plaintiff in this county/District, and Legally Mine is subject to personal jurisdiction in this county/District. Because, among other facts, Legally Mine operates in any state by way of its website, mylegalstronghold.com, and provides much of its contractual language by way of weblink, its principal place of business in California is its Utah location from which it directs and maintains this website. *See* Declaration of Kasra Eliasieh stating these facts, attached (again) to this Complaint as Exhibit 1.

## FACTUAL ALLEGATIONS

### Legally Mine and Its Hard Sell of Expensive Asset Protection Products/Services

4. Legally Mine peddles fear to medical professionals. It emphasizes the risk of medical malpractice lawsuits and judgments and describes itself as "the largest, most respected, experienced, and comprehensive lawsuit protection company in America." It's advertised promise: "We provide specialized consulting, packages and tools to help businesses and practices manage risk."

5. But Legally Mine does not sell malpractice insurance. Rather, Legally Mine tries to convince physicians that no amount of insurance is enough and that predatory plaintiffs' lawyers nonetheless have access to the physicians' hard-earned assets. Their families are at risk. Featured, not just in color but in font size is the following: "The most recent statistics cite that nearly $4 billion ($168 million more than the previous year)

COMPLAINT [CLASS ACTION] - 2

was spent in medical malpractice payouts, nearly a 5% increase from the year previous." What is needed, Legally Mine says, is a web of complex legal corporate structuring that Legally Mine can provide.

6.      Legally Mine operates across the country, including within California. Legally Mine promises "use of entities in multiple states" – "it is not enough to know your own state laws," they say, "it is required to know all the state laws in order to achieve maximum protection." "Where can Legally Mine operate?" "Legally Mine can help customers in all 50 states, and continues to stay up to date on laws in all 50 states. We can help you wherever you live or do business (within the United States)." They present "at over 250 events across the US per year". On information and belief, some of these events are in California. A California physician scare story is featured in Legally Mine's promotional information.

7.      On information and belief, Legally Mine travels to events/association meetings all over the country, including California, to sell its products in general and its asset protection plan specifically. On information and belief, Legally Mine is certified to provide continuing medical education credits in California.

            The oral pitch

8.      Legally Mine's pitch is high on dramatic presentation. Its speakers emphasize the risks of financial disaster not just from known risks but from unknown risks, and the increasing nature of these risks.

9.      Legally Mine's pitch is "this day only" – i.e., the only time it is available is immediately after the presentation at the back of the room, where people are standing by to take credit card payments and provide the fine-print contracts. Legally Mine counts on the time pressure not just at the end of its presentation but due to the fact that its presentation occurs in between other presentations that physicians need to attend, as well as the peer pressure from any physicians attracted to the scheme.

            Materially misleading

10.     Legally Mine's pitch is also materially misleading. Legally Mine promotes a two-part asset protection program, identified as "A," "Premium Asset Protection Premium +" and "B," "Premium Asset Protection Document Access with Entity Creation." Each is a product as well as a service. In reality, these are the same product/service, but the vague and overlapping categorization of products/services associated with each, along with the relatively inexpensive pricing of "A," combined with the "entity creation" and "tax savings guarantee" associated with "B" is designed to lead physicians to pay for both products in order to

COMPLAINT [CLASS ACTION] - 3

obtain the same service. As of 2016, Product A cost $150/month or $1,800 up front for 1 year of service. Product B cost $6,000 (Contract 1).

11. For example, the price of both products is identified on Contract 1 and totaled to $7,800.

12. Contract 1 says that "Product A," otherwise known as "Premium Asset Protection Premium +" or "P+," includes amorphous corporate legal assistance: "ongoing available web-software updates, annual document review & blueprint, continued Legal Team support and access to a personal consultant for help with legal entities, continued entity document creation, annual filing of corporate minutes, & exclusive P+ tax benefits." But this is what is provided in "Product B": "Product B," otherwise known as "Premium Asset Protection Document Access with Entity Creation ("DAECP"), provides "access to over 100 specially designed legal documents through mylegalstronghold.com," along as "complimentary service pertaining to the creation of legally entities, and support for legal documents." Elsewhere on Contract 1, this is described as "Unlimited Entity Creation."

13. The brochure, likewise handed out to any contracting physician and containing the physician's "Unique Registration Code" (Contract 2), makes the identity clear. "Asset Protection Premium +" (i.e., "A") includes everything advertised within "B":

"1. Exclusive services.

*Your Premium+ subscription also covers the fees for a Qualifying Registered Agent;

*We create and file your annual corporate minutes (taking care of the complicated corporate formalities on your behalf);

*Additional content on MyLegalStronghold.com;

*In addition to e-files, we'll send you hard copies of all the completed legal documents we create for you.

2. Ongoing expert assistance.

*Continued Available Legal Software/Document Updates

*Continued MyLegalStronghold.com Access

*Continued Unlimited Entity Creation (after price cap has been met)

*Continued access to legal consultants and experts

3.Annual services & benefits

COMPLAINT [CLASS ACTION] - 4

1 *Comprehensive update and review of all documentation

2 *Review and update of your Tax Savings Plan

3 *Review and update of your Asset Protection Blueprint"

4 14. Everything offered in "B" is included in "A" Most specifically, both "Creating Your Entities" and "Entity

5 Creation" fall expressly within the purview of Asset Protection Premium +.

6 <u>Money-back guarantee</u>

7 15. To make it easier for physicians to take out their credit cards, Legally Mine orally offers a broad money-

8 back guarantee during its presentation: nobody will lose money on this; there is no risk. To the extent that

9 what Legally Mine actually sells and its value is unclear, the money-back guarantee is quite clear.

10 16. The most repeated way in which physicians will save money, Legally Mine says, is "tax savings." These

11 tax savings are part and parcel of both "A" and "B." With "A," Contract 1 explains that a physician obtains

12 "exclusive P+ tax benefits," and while the "Tax Savings Guarantee" is particularly identified in Contract

13 1's column for "B," Contract 2 makes clear that the "Tax Savings Plan" is firmly part of the "Asset

14 Protection Premium +," i.e., "A" as well. The "Tax-Savings Money-Back Guarantee" (Contract 3), likewise

15 provided to physicians who contract with Legally Mine, speaks of the "Legally Mine Program" without

16 distinguishing between "A" and "B."

17 17. Orally, Legally Mine makes clear that physicians can recover their payments for any reason if they write to

18 Legally Mine by way of its web portal. Legally Mine's Contract 1 does this in two ways. On the front,

19 Legally Mine makes clear that any termination that it grants must be in writing, not telephonically. "By

20 signing below, I understand that, unless specified in writing, ALL SALES ARE FINAL." How is a

21 physician to obtain that written dispensation? The back of Contract 1 explains (in the context of "Product

22 A" specifically.)  Under "Termination," most of the way down the reverse of Contract 1, Legally Mine

23 explains that the contract is in effect "until a formal request for membership termination is received by

24 Legally Mine prior to this original or any renewal membership terms expiring." Specifically, the request

25 must be submitted through the company's "submission portal" and between 45 and 15 days of the date the

26 initial or renewal term expires. Upon such a submission, there is no discretion that Legally Mine can

27 exercise to deny termination and refund. Legally Mine must write back granting both.

28

18. The *only* restriction on termination and refund is where Legally Mine has provided proprietary information to the physician. In that circumstance, as explained in the "Notice of Termination" at the bottom of Contract 1, reverse, no transactions with Legally Mine or undertaken with its advice can be undone. That is because the proverbial cat is out of the bag.

19. But Legally Mine does not actually allow physicians to terminate their agreements and obtain refunds regardless of the reason and even if Legally Mine itself breaches the parties' contract before providing any information of value. Should the physician actually proceed to the "submission portal," whether because directed by Contract 1 or by Legally Mine's representative by telephone or email, a new onerous contract entitled "service discontinuation request" appears. The physician must check off "I agree to be subject to the terms and conditions of this service discontinuation request, as outlined (in 6 paragraphs) below" before clicking "submit request" ("Contract 4"). Contract 4 contains various onerous threats should the physician attempting termination violate Contract 4, including automatic rejection of the termination request, a 21% surcharge penalty on the contract price, elimination of the right to arbitrate (or litigate), and recovery of attorney's fees and costs. The intent and effect of Contract 4 is clear: there are to be no terminations and no refunds for any reason.

**Legally Mine and Its Multi-Document Contract with Plaintiff**

20. On or about October 13, 2016, Legally Mine made a presentation at a Physician Lunch and Learn event entitled "The Keys to Locking Out Lawsuits and Lowering Taxes" at a conference sponsored by the American Society of Ophthalmic Plastic and Reconstructive Surgery ("ASOPRS"), a gathering of physicians, in Chicago, Illinois. The speaker was Leland McKay, a presenter and promoter.

21. At that meeting, Mr. McKay spoke for about 45 minutes. He said that Legally Mine guaranteed all of the 100 physicians present in the room significant tax savings over what each was presently paying. He offered a money-back guarantee. No one in the room would lose money. He said that Legally Mine would reimburse up to the full cost of payment any amounts spent not saved in taxes. He said that Legally Mine almost never needed to make refunds because they always save the client an amount in taxes that exceeds the cost of the program. He said there was no risk in paying.

22.   Plaintiff was interested in purchasing Legally Mine's products/services as a consumer of financial services because he wanted to protect his personal finances from business risks and believed that this was precisely what Legally Mine's products/services were designed to do and would in fact do.

23.   Plaintiff relied upon Mr. McKay's promise that Legally Mine would return his money if Legally Mine did not deliver.

24.   Plaintiff went to the back of the room and was handed a two-sided single page document, Contract 1. Nothing about the document struck him as at odds with what Mr. McKay had said. No one from Legally Mine told him either that the document might contain terms at odds with what Mr. McKay had said or that if there was any discrepancy, Contract 1 would control. Plaintiff reasonably believed Contract 1 conformed to the representations he had heard during the presentation, provided his credit card information as requested, and signed it.

<u>Contract 1: the arbitration clause</u>

25.   Contract 1 contained an arbitration clause. In small print at the bottom of the document, Contract 1 stated: "I also acknowledge I have read, understand, and agree to the terms described in the 'Check Policy,' 'Consent to Binding Arbitration,' 'Terms and Conditions," and 'Notice of Termination' sections on the reverse side of this Agreement." The reverse of the document consisted of dense small font, single space text that included not just the topics identified in the previous paragraph but "Finance Option." At the bottom of the portion of the back page that contained the "Check Policy," "Consent to Binding Arbitration," "Terms and Conditions," and "Finance Option" was a space for the purchaser to indicate his or her confirming signature. Plaintiff signed Contract 1. Based upon this signature, Magistrate Judge Corley ordered the parties' dispute over Contract 1 (as well as Contracts 2 -4, discussed below) to arbitration, with all contract defenses to be determined by the arbitrator. *See* Case No. 3:18-cv-3622, filed August 16, 2018, Dock. 66 (Order, April 30, 2019).

<u>Contract 1: the other terms</u>

26.   This contract, Contract 1, had two sides. The top of the form asked for his full name and address, home phone, cell phone, work phone, and email. Plaintiff provided this information, writing it down on the form as requested.

COMPLAINT [CLASS ACTION] - 7

27. The front of this document contained boxes that could be checked for Product A and Product B, text indicating in more detail the product and the price, a total amount "collected at the event" by check or credit card, and a space for date and signature. Plaintiff requested both Products A and B.

28. The middle part of the form asked for his personal credit card number, its expiration date, and its three-digit security code (CVV2). This part of the form was particularly large and set apart from other text and encircled the required information with a dotted line. Plaintiff provided the information, writing it down on the form as requested.

29. Plaintiff authorized Legally Mine to charge his personal credit card the amount of $7,800 ($1,800 for Part A and $6,000 for Part B), dating the form 10/13/16.

30. According to Contract 1, Plaintiff agreed to be billed $1,800 for 12 months starting 10/13/16 ("P+" membership). For this money, he was to receive "ongoing available web-software updates, annual document review & blueprint, continued Legal Team support and access to a personal consultant for help with legal entities, continued entity document creation, annual filing of corporate minutes, & exclusive P+ tax benefits."

31. Plaintiff has received no product or service for his $1,800 – not then, and not thereafter.

32. According to Contract 1, Plaintiff enrolled in "DAECP" and was to receive "access to over 100 specially designed legal documents through mylegalstronghold.com."

33. Plaintiff did not receive the DAECP product at that time, as indicated by the "'DAECP' Product Received" box at the bottom of the form. He was not provided with any password or access to mylegalstronghold.com. He did not initial the box at the bottom of the form indicating "'DAECP' Product Received."

34. In the middle of the form, the handwritten "Oct 18 9:00 am" indicates that Legally Mine was to call Plaintiff at that date and time to obtain certain financial information.

<u>Contracts 2 and 3</u>

35. Plaintiff was provided with two additional documents after signing the contract: the brochure (Contract 2) and the guarantee (Contract 3).

36. Contract 2 promised that Legally Mine was typically able to complete a physician's asset protection program (clearly including "Legally Mine Asset Protection Premium +") "within a matter of weeks" –

COMPLAINT [CLASS ACTION] - 8

specified as 4-6 weeks. This is dependent upon a physician's "prompt assistance" in providing the "necessary information and signatures." Estate planning, by contrast, can occur within 2-4 weeks.

37.     None of this was done for Plaintiff. As promised in Contract 1, Legally Mine did not call Plaintiff on October 18 at 9:00 am or otherwise provide any of this work.

38.     Contract 2 explains that those who purchase Legally Mine Asset Protection Premium + are entitled to (1) exclusive services including a Qualifying Registered Agent, the creation and filing of corporate minutes, additional content on the website "mylegalstronghold.com," and hard copies of any legal documents created; (2) ongoing expert assistance including legal software and document updates, access to mylegalstronghold.com, unlimited entity creation "after price cap has been met" (never explained in the contract), and continued access to legal consultants and experts; and (3) annual services and benefits including comprehensive update and review of documentation, review and update of Tax Savings Plan, and review and update of Asset Protection Blueprint."

39.     None of this was done for Plaintiff, whether by October 18 or thereafter.

40.     Contract 2 states that the "total cost of everything we offer each member of our Premium + program would be more than $11,000. Contract 2 states that the price charged, when compared to the $11,000 total cost, constitutes "a 90% savings for every single one of our customers."

41.     For the price of what a customer purchases from Legally Mine to be a 90% savings, the price would have to be .9 x $11,000 -- a savings of $9,900 and a discounted cost of $1,100. No price offered to Plaintiff came close. Even if he selected just Asset Protection Premium +, the price offered (which he paid) was $1,800. This is an overcharge of $700.00.

42.     Contract 3 states: "Legally Mine Tax-Savings Money-Back Guarantee. If within the first year, after completing the initial Legally Mine Program, you have not received or are not projected to receive tax and/or insurance savings equal to or more than your total purchase price for the Legally Mine Program, then you will receive a refund of the calculated difference between your cost for the Legally Mine Program (not including state filing fees and/or registered agent fees) and the amount you actually saved by implementing the program." Attachment C did not define the "initial Legally Mine Program," but by failing to follow up with Plaintiff as promised and thereafter not providing any products or services, Legally Mine has precluded Plaintiff from completing whatever the initial Legally Mine Program may have been, has

COMPLAINT [CLASS ACTION] - 9

made sure that Plaintiff will not be able to receive tax and/or insurance savings equal to or more than his purchase price, and is obligated to honor its contractual guarantee to refund his costs.

### Plaintiff's attempted termination and Contract 4

43. As promised in Contract 1, Legally Mine did not call Plaintiff on October 18 at 9:00 am or otherwise.

44. On October 25, Plaintiff called Legally Mine. Legally Mine was unaware of any obligation to call Plaintiff. Legally Mine set up a time to telephone Plaintiff later that day. Later that day, Legally Mine called and asked for certain financial information from Plaintiff.

45. Following that call, Plaintiff had regrets and thought the program a likely scam. He emailed Legally Mine the next day, October 26, expressing his desire that Legally Mine do nothing on his behalf and his desire to cancel.

46. On October 27, Legally Mine emailed Plaintiff confirming Legally Mine would do no work on Plaintiff's behalf. It has done and has continued to do no work for Plaintiff.

47. On November 1, Legally Mine directed Plaintiff to the web link he would need to access in order to obtain a refund.

48. When Plaintiff accessed that site from his home in California, he saw lengthy, dense and confusing set of warnings and conditions, including: "I AGREE TO BE SUBJECT TO THE TERMS AND CONDITIONS OF THIS SERVICE DISCONTINUATION REQUEST, AS OUTLINED BELOW." Those terms and conditions were Contract 4, described above. He was apprehensive about proceeding so did not.

49. Plaintiff emailed the president of ASOPRS to complaint about Legally Mine on March 28, 2017.

50. On May 17, 2017 Plaintiff filed a complaint about Legally Mine with the FTC.

51. Plaintiff looked into filing a complaint with the Consumer Financial Protection Bureau but was told that this matter did not fall into their jurisdiction.

52. On May 17 Plaintiff again wrote asking for a refund, certified mail. Legally Mine never responded. Legally Mine retains Plaintiff's money yet has provided no services.

53. Plaintiff has engaged the undersigned attorneys concerning this dispute and has agreed to pay them a reasonable fee.

54. More than 30 days prior to the commencement of this action, undersigned counsel wrote, by certified mail, return receipt requested, to Legally Mine at 225 W. 520 N, Orem, Utah 84057, the location where a

substantial part of the transaction occurred and the headquarters from which it conducts its business in California, demanding that Legally Mine correct, repair, replace or otherwise rectify the goods or services in violation of unlawful practices detailed by section 1770. The letter is attached hereto as Exhibit 2. No response has been received. In the more than 30 days that have passed, Legally Mine has not communicated any appropriate correction, repair, replacement, or other remedy, or agreed to make such response within a reasonable time. *See* Declaration of David M. Rosenberg-Wohl stating these facts, (again) attached hereto as Exhibit 3.

**CLASS ACTION ALLEGATIONS**

55.     **Class definition**.

    a.   All California physicians and dentists who signed up for an asset protection plan with Legally Mine, and tried to terminate the contract and obtain a refund before obtaining reasonably confidential information from Legally Mine, commencing up to four years prior to the filing of Case No. 3:18-cv-3622.

    b.   All California physicians and dentists who signed up for asset protection product services A and/or B with Legally Mine, and tried to terminate the contract and obtain a refund before obtaining reasonably confidential information from Legally Mine, commencing up to four years prior to the filing of Case No. 3:18-cv-3622.

    c.   All California physicians and dentists who signed up for an asset protection plan with Legally Mine, and tried to terminate the contract and obtain a refund before the contract term ended, commencing up to four years prior to the filing of Case No. 3:18-cv-3622.

    d.   All California physicians and dentists who signed up for asset protection product services A and/or B with Legally Mine, and tried to terminate the contract and obtain a refund before the contract term ended, commencing up to four years prior to the filing of Case No. 3:18-cv-3622.

    e.   All California physicians and dentists who signed up for an asset protection plan with Legally Mine, who paid using a credit card, from any time to the present.

    f.   All California physicians and dentists who signed up for an asset protection plan with Legally Mine, who paid using a credit card, commencing up to four years prior to the filing of the original iteration of this complaint, Case No. 3:18-cv-3622, filed August 16, 2018.

g.  All California physicians and dentists who signed up for asset protection product services A and/or B with Legally Mine, who paid using a credit card, from any time to the present.

h.  All California physicians and dentists who signed for asset protection product services A and/or B with Legally Mine, who paid using a credit card, commencing up to four years prior to the filing of the original iteration of this complaint, Case No. 3:18-cv-3622, filed August 16, 2018.

56.  Numerosity. There are so many potential class members that individual joinder of class members is impractical. There are thousands of doctors and dentists in California, each of whom regularly attend conferences for continuing medical education credit and general knowledge, who are exposed to and attend Legally Mine presentations, whether in California or in other states.

57.  Commonality. There are questions of law or fact common to class members. The Legally Mine presentations are materially uniform, regardless of the audience and regardless of the state.

58.  Typicality. Claims of representative are typical of those of absent class members. As a physician who heard a Legally Mine pitch and purchased the products/services, Plaintiff is in precisely the same position as any other physician or dentist who listened to a Legally Mine pitch and was convinced to contract with Legally Mine to save assets. Outside of the context of a hard sell presentation, it is reasonable for individuals, especially professionals, to reconsider what they have heard and what they have signed, to investigate somewhat the presenters, to have second thoughts and seek a refund. The proposed classes include only such individuals. They exclude individuals who were either happy with their choices or happy enough that they terminated their memberships, if at all, only after the completion of a full year's contract. To the extent there are plaintiffs who might have a claim for breach of the tax savings guarantee after completion of a year's contract, Plaintiff is not typical of this group and does not seek to represent any such individuals.

59.  Adequacy of representation. Class counsel and Plaintiff intend to fairly and adequately protect the interests of absent class members. Class counsel has participated in – and is presently pursuing – a number of class action matters. Plaintiff understands that he proceeds here not just for himself but for all similarly situated.

**FIRST CLAIM FOR RELIEF – Breach of Contract**

**(Cal. common law)**

60.  Plaintiff incorporates by reference and hereby re-alleges the allegations of paragraphs 1-59 of this Complaint as if fully set forth herein.

COMPLAINT [CLASS ACTION] - 12

1     61.     Because Legally Mine and Plaintiff entered into a contractual relationship under which Plaintiff was free to

2           terminate and obtain a refund, Plaintiff sought to do so under the contractual terms, and Legally Mine

3           nonetheless refused to provide a refund, Legally Mine has breached its contractual relationship with

4           Plaintiff and is liable to Plaintiff in damages, most specifically a full refund.

5                     **SECOND CLAIM FOR RELIEF – Illegal Contract/Unfair Retention of Benefit**

6             **(California Civil Code sections 1689.20-24; 1668; California Bus. & Prof. Code sec. 17200)**

7     62.     Plaintiff incorporates by reference and hereby re-alleges the allegations of paragraphs 1-61 of this

8           Complaint as if fully set forth herein.

9     63.     If the parties do not have a contractual relationship requiring Legally Mine to refund Plaintiff his money

10          upon Plaintiff's submission of his written cancellation request, then Legally Mine's retention of Plaintiff's

11          money while failing to provide Plaintiff with any benefit violates the law. Any construction of the

12          contractual relationship not permitting Plaintiff to cancel and obtain a refund within three days of this high-

13          pressure seminar sale is in violation of Cal. Civ. Code sections 1689-.20-24 as well as section 1668 and

14          should not be enforced, and Legally Mine's retention of payment without conferral of benefits violates

15          California's common law action of money had and received and supports an action for unjust enrichment

16          requiring a refund and/or restitution. Finally, Legally Mine's conduct violates Cal. Bus. & Prof. Code sec.

17          17200, the UCL, in that the conduct is not only unlawful (as set forth above in this paragraph) but it is also

18          unfair and fraudulent. All of these legal bases justify not just a full refund/restitution but injunctive relief.

19                         **THIRD CLAIM FOR RELIEF –Misrepresentation**

20                **(Cal. Civ. Code sec. 1770; Cal. Bus. & Prof. Code secs. 17500 and 17200)**

21     64.     Plaintiff incorporates by reference and hereby re-alleges the allegations of paragraphs 1-63 of this

22          Complaint as if fully set forth herein.

23     65.     Regardless of whether or not the parties have a contractual relationship under which Plaintiff is entitled to a

24          refund, Plaintiff entered into a contractual relationship with Legally Mine reasonably relying upon

25          representations, oral and written, made by Legally Mine – representations which were false. These include

26          representations that are actionable under the CLRA, Cal. Civ. Code sec. 1770, e.g., that the

27          products/services had characteristics and/or qualities they did not have [(a)(5)], representations concerning

28          the reduction of prices should items have been purchased separately [(a)(13) and (17)], representations that

Plaintiff had rights and remedies he did not in fact have [(a)(14)], and representations that were unconscionable, as stated above [(a)(19)]. The false representations are also actionable as false advertising under California's FAL, Cal. Bus. & Prof. Code sec. 17500. The false representations led to a contract that is illegal and otherwise unenforceable under Cal. Civ. Code sec. 1668. The false representations are actionable as well as unfair competition under Cal. Bus. & Prof. Code sec. 17200. All of these legal bases justify not just a full refund/restitution but injunctive relief.

**FOURTH CLAIM FOR RELIEF – Insufficient Disclosure of Auto Renewal/Cancellation Terms**

**(Cal. Bus. & Prof. Code sec. 17602; Cal. Civ. Code secs. 1770(a) & 1668; Cal. Bus. & Prof. Code sec. 17200)**

66. Plaintiff incorporates by reference and hereby re-alleges the allegations of paragraphs 1-65 of this Complaint as if fully set forth herein.

67. Regardless of whether or not Legally Mine failed to sufficiently disclose its terms of auto renewal and cancellation terms fraudulently, Legally Mine's failure to comply with California law in this regard (Cal. Bus. & Prof. Code sec. 17602) constitutes a violation of law sufficient for a violation of Cal. Civ. Code secs. 1770(a)(13, 14 and 19), Cal. Civ. Code sec. 1668, and Cal. Bus. & Prof. Code sec. 17200. All these bases justify not just a full refund/restitution but injunctive relief.

**FIFTH CLAIM FOR RELIEF – Disclosure of Credit Card Information**

**(Cal. Civ. Code secs. 1747.08(a); 1668; Cal. Bus. & Prof. Code sec. 17200)**

68. Plaintiff incorporates by reference and hereby re-alleges the allegations of paragraphs 1-67 of this Complaint as if fully set forth herein.

69. Legally Mine knew or should have known or was grossly negligent regarding the fact that requiring Plaintiff to disclose his credit card details on a publicly available and producible sheet of paper violated consumer privacy and specifically the Song-Bervely law in California, Cal. Civ. Code sec. 1747.08(a). Legally Mine had no practices in place to avoid this sort of disclosure; in fact, the form that it drafted features it.

70. Legally Mine requested, or required, as a condition for accepting Plaintiff's credit card, that Plaintiff write personal identification information upon the credit card transaction form, that Plaintiff provide personal identification information, which Legally Mine caused to be written on the form, and utilized a credit card form which contained preprinted spaces specifically so designated.

COMPLAINT [CLASS ACTION] - 14

71.     Until the bringing of this lawsuit, Plaintiff had no reason to suspect that this disclosure of credit card information was improper or illegal. Plaintiff had intended to authorize use of his credit card for this purpose, and that is what Legally Mine did. Without being a lawyer, Plaintiff would have no way of knowing that the requirement of providing his credit card details in this manner was improper or illegal.

**DEMAND FOR RELIEF**

72.     WHEREFORE, Plaintiff prays for judgment against Legally Mine and all Defendants that:

a.     Defendants be preliminarily and permanently enjoined from committing the acts alleged herein as well as be declared in violation of each of these laws;

b.     Plaintiff be entitled to rescind his contract;

c.     Defendants be ordered to provide a refund/restitution to Plaintiff;

d.     Defendants be ordered to pay Plaintiff's actual, consequential, incidental and special damages.

e.     Defendants be ordered to pay Plaintiff's attorneys' fees and costs to the extent available under the statutes sued hereunder;

f.     Plaintiff be awarded punitive damages; and

g.     Plaintiff be awarded such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff respectfully requests a jury trial on all issues triable thereby.


Dated this 24th of September, 2019.


/s/ David M. Rosenberg-Wohl
David M. Rosenberg-Wohl
HERSHENSON ROSENBERG-WOHL
A PROFESSIONAL CORPORATION

COMPLAINT [CLASS ACTION] - 15